## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**CARLOS RUBILDO-ROSA,**

Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY,**

Defendant.

Civil No. 16-2584 (ADC)

## REPORT AND RECOMMENDATION

Carlos Rubildo-Rosa ("Rubildo") seeks review of the Commissioner's decision finding he is not entitled to disability benefits under the Social Security Act ("Act"), 42 U.S.C § 423, as amended. Rubildo asks for judgment remanding the case to the Commissioner for further proceedings. (Docket Nos. 1, 17). The Commissioner answered the complaint and filed a memorandum. (Docket Nos. 13, 18). This case is before me for a report and recommendation. (Docket No. 15, 16). After careful review of the administrative record and the briefs on file, I recommend that the court reverse the Commissioner's decision and remand as further discussed below.

## STANDARD OF REVIEW

The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm

the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity ("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this

work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Rubildo was born on November 4, 1967, completed one year of college education, does not understand English, and worked from 1990 to 2011 as a medical emergencies technician, correctional officer, and van driver. Social Security Transcript ["Tr."] 210, 215, 223-224, 338, 350, 354-355, 361, 417. He last met the insured status requirements of the Act on December 31, 2015 (date last insured). Tr. 210. Rubildo applied for disability insurance benefits on August 30, 2012, claiming to have been disabled since June 21, 2011 (alleged onset date) at 43 years of age[1] due to an emotional condition, pain and muscle spasms, pain and numbness in his hands, disk conditions in the cervical and lumbar area, and neuropathy, and has not worked since. Tr. 73, 210, 338, 350. The claim was denied initially and on reconsideration. Tr. 73, 77, 209, 223. A hearing before an ALJ was held on October 24, 2014. Tr. 37-72. On November 14, 2014, the ALJ found that through the date last insured, and considering Rubildo's age, education, work experience, and RFC, there

---

[1] Rubildo was considered to be a younger individual (Tr. 30), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

were jobs that existed in significant numbers in the national economy that Rubildo could perform, and he was therefore not disabled as defined in the Act. Tr. 30-31. Rubildo requested review of the ALJ's decision, and on July 11, 2016, the Appeals Council denied Rubildo's request, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-9. The present complaint followed. Docket No. 1.

***Treating physicians***

### *State Insurance Fund ("SIF")*

Rubildo filed a work accident claim with the SIF on June 21, 2011. (Tr. 82, 84, 340-341). Rubildo felt intense cervical pain (7 on a scale of 10), and various tests were conducted during the following months. X-rays of the cervical spine showed straightening of the vertebral bodies, most likely related to a muscle spasm. Tr. 494. An MRI of the cervical spine also showed straightening of the vertebral bodies and posterior disc abnormality at several levels of the cervical spine, with no abnormal signal intensity within the cervical spinal cord and no nerve impingement. Tr. 491. An electromyography ("EMG") of the superior extremities showed bilateral median nerve calcaneal and demyelinating neuropathy, but no radiculopathy. A hand surgery evaluation was also recommended. Tr. 454, 500.

Rubildo was diagnosed with a cervical strain, oriented on treatment, and was prescribed anti-inflammatories, muscle relaxants, and physical therapy. He was also ordered to remain on rest status (versus continuing to work while receiving treatment), and was referred to an occupational therapist and a physiatrist. Tr. 134, 138-139, 446, 456-457, 460-461, 465, 489.

In November 2011 and February 2012, Dr. Robin Santiago-Delgado ("Dr. Santiago") found that Rubildo showed a normal cervical spine, with normal active range of motion, but with tenderness on palpation. Tr. 483-486. In May 2012, Dr. Santiago found that Rubildo showed a decreased active range of motion in the cervical spine, with tenderness on palpation. Tr. 462. During this period. Dr. Santiago found Rubildo to be alert, awake, active, and oriented at all times, and that his upper and lower extremities were within normal limits.

Rubildo was also referred to a neurologist, Dr. Hector Stella-Arrillaga ("Dr. Stella"). Tr. 131, 453. In May 5, 2012, Dr. Stella evaluated Rubildo and diagnosed cervical

sprain and C6-C7 protrusion. Dr. Stella found tenderness to palpation on both trapezii when he evaluated Rubildo for cranial nerve functions, and bilateral Adson's sign (but no Tinel's sign) in his extremities. All other functions appeared normal. As to general and specific cerebral functions, Rubildo was alert, oriented in all spheres, with adequate judgment and calculation, and no agnosia, apraxia, or aphasia. As to cerebellar functions, Rubildo showed adequate finger to nose and alternation movements. His gait and station were normal. Muscle size, tone, and strength, and superficial tactile sensation were also adequate. Dr. Stella prescribed medications and ordered further studies. Tr. 488.

A median somatosensory-evoked potential test, dated June 6, 2012, showed normal results, with no evidence of dorsal column and/or lemniscal pathway abnormality. Tr. 468. An upper extremity arterial and vein study showed subclavian artery compression in both arms. Fingers were normal. Tr. 213, 470, 478. Dr. Stella prescribed medications on August 13, 2012. Tr. 450-451.

X-rays dated January 11, 2013 revealed a normal cervical and thoracic spine. Tr. 211.

### Hospital Dr. Alejandro Otero-Lopez and Manati Medical Center

Rubildo had left inguinal hernia ambulatory surgery performed by Dr. Orlando Rodriguez ("Dr. Rodriguez") on October 10, 2011, after Rubildo exhibited lower abdominal pain for two to three weeks. Tr. 425-431, 437-443. Chest x-ray results were normal. Tr. 212.

### Dr. Victor J. Mariano-Mercedes ("Dr. Mariano")

Dr. Mariano treated Rubildo from March 23, 2012 to September 2014 for depression, anxiety, irritability, melancholy, and feelings of frustration and worthlessness. Tr. 381, 542-547. Progress notes from March, May, and August 2012 are illegible (Tr. 546-547), but elsewhere in the record it appears that on August 17, 2012, Dr. Mariano found that Rubildo was oriented in person and place, but was affected in time. He also appeared to be incoherent, irrelevant, and illogical; presented diminished attention and judgment, poor insight, and poor stress tolerance; and was experiencing visual and auditory

hallucinations. His Global Assessment of Functioning ("GAF")[2] was at 40, and he was unable to complete a task. Dr. Mariano assessed that it was unknown if Rubildo was capable (Tr. 212, 230), and prescribed medications (Ativan, Celexa, Xanax) to control depression and anxiety, and to improve sleep patterns. Tr. 356, 382, 418.

A psychiatric medical report (in questionnaire format) that Dr. Mariano provided to the SSA, dated November 1, 2012, is mostly illegible. Tr. 432-436. The legible parts (see translations at Tr. 113-117) indicate that Rubildo had no motivation or interest in doing anything, could not sleep, would get confused, and would forget things. Rubildo had no history of alcohol or substance abuse, no remission or hospitalization, and did not present high risk behavior. Tr. 113-114, 432-433. He appeared to be slow, incoherent, wasn't able to make associations, and had auditory and visual hallucinations. *Id.* He was oriented in person and place, but not as to time. His memory (immediate, short term, recent, and remote), attention, intellectual functions, and judgment were diminished, but his concentration was good only as to reciting the months of the year and days of the week backwards, but not as to subtracting in series of 3 and 7. His insight was very poor. Tr. 115-116, 434-435. As to current functioning in terms of frequency, independence, and effectiveness, Rubildo's activities of daily living were diminished. He had no social functioning, could not tolerate stressful situations, and had no ability to focus attention on and persist in tasks, or ability to complete a normal workday without interruption. Rubildo had no episodes of panic attacks. Tr. 116, 435. The portions of the report related to initial treatment, changes in treatment and medications, compliance, and side effects are illegible. Dr. Mariano diagnosed Rubildo with major depressive disorder, with a very poor prognosis

---

[2] "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. A GAF score between 51 and 60 indicates 'moderate symptoms' or 'moderate difficulty in social occupational, or school functioning.'" *Hernandez v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 f.n. 1 (D.P.R. 2013)(*quoting* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR)). "The GAF score range between 41 and 50 is described as '[s]erious symptoms … OR any serious impairment in a social, occupational, or school functioning …'" *Id.* at f.n. 2.

"[T]he GAF rating system . . . is not raw medical data; rather, the system provides a way for a mental health professional to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *González-Rodríguez v. Barnhart*, 111 Fed. Appx. 23, 25 (1st Cir. 2004) (per curiam) (unpublished) (*citing Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

and a GAF of 40, and prescribed medications. Dr. Mariano also assessed that Rubildo was unable to handle funds. Tr. 117, 436.

Six progress notes from 2013 show that Rubildo was cooperative. His thoughts were relevant in some appointments, and incoherent during others. His orientation, judgment, and insight were poor. His memory as to recent events and his attention and concentration were altered. Tr. 189-191, 543-545.

Four progress notes from 2014 show that Rubildo was sometimes affable, sometimes sad, but at all times cooperative, coherent, oriented, and showed good memory, attention, concentration, judgment, and insight. He Tr. 196-197, 550-551.

Dr. Mariano added on October 6, 2014 in a medical certificate that he treated Rubildo for major depression and generalized anxiety, and that Rubildo had also received treatment with Dr. Vazquez-Sotomayor for a year and a half, with a hospitalization at Hospital San Juan Capestrano in July 2013. In his opinion, Rubildo was totally and permanently disabled to work or learn a profession, and needed to remain under treatment indefinitely. Tr. 198, 552.

### Hospital San Juan Capestrano

Rubildo was admitted to a partial hospitalization program at Hospital San Juan Capestrano from July 9 to 15, 2013 for depression. His GAF was at 50. Rubildo listed financial problems, inability to work, problems at home, not having a car, and not being able to sleep enough as circumstances that place him at emotional risk. He was asked what he could do to keep calm, and he answered staying at home in his room.  He was prescribed medications and ordered to continue with outpatient treatment. At the hospital, Rubildo achieved the following treatment goals: joined group therapies (but did not actively participate in them), showed commitment with his healing process and discharge plan, and developed knowledge on his psychiatric condition. Rubildo also learned more about identifying his physical conditions and strategies to remain stable, and about the importance of continuing with his pharmacological treatment as prescribed by his doctor. Tr. 175-181, 529-535.

### Dr. Mariela Cubano-Alfonso ("Dr. Cubano")

Rubildo was also treated by Dr. Cubano, clinical psychologist, starting on July 2, 2013. Tr. 182, 380, 418, 5366. There is evidence of eight progress notes, from four

appointments in 2013 and four appointments in 2014, which indicate that Rubildo suffered from a recurrent major depressive disorder and generalized anxiety, and received pharmacological psychiatric treatment. He could not work because of his physical conditions and felt powerless because he could not do things he used to do before. He appeared to be coherent and oriented, but sad, frustrated, and decompensated, with poor visual contact. He was not expressive. The therapy that Dr. Cubano provided was targeted to managing and monitoring his emotional state and frustration, to help him accept his health conditions, to help him express his state of mind and emotions, to help him understand the importance of delegating, to improve his self-esteem, and to promote participation in activities of daily living. He showed no suicidal or homicidal thoughts. Tr. 183-187, 194-195, 199-200, 537-541, 548-549, 553-554. He was also taught breathing techniques for his dyspnea and instructed on how to do it to control himself and manage his emotional condition. Tr. 183, 537.

### Clinica Deportiva Las Vegas

Rubildo received physical therapy for muscle spasm and medications in 2014, with Dr. Luis Goveo-Ortiz. Tr. 201-208, 555-563.  Rubildo was first evaluated on September 10, 2014, and complained of strong back and neck pain. Progress notes show that the pain decreased in intensity, and that Rubildo was able to perform exercises with no problem. Tr. 201-203, 555-557.

### Procedural History

After applying for disability insurance benefits on August 30, 2012 (Tr. 338), Rubildo submitted a pain description questionnaire and a function report (Tr. 93-102, 367-376) claiming that his back condition affected his ability to get up, squat, bend, walk, and climb stairs. His conditions also affected his memory, concentration, and ability to understand, follow instructions, and complete tasks. He did not check-mark being affected in his ability to stand, reach, sit, kneel, talk, hear, see, use his hands, or get along with others. He could walk for five to ten minutes before needing to stop and rest. He could only pay attention for a very short period of time, and needed help to carry out written and spoken instructions because he was distracted and forgetful. Tr. 100, 374. (Later, in a second function report dated August, 2013 (Tr. 103-112, 386-395), Rubildo additionally

check-marked that his back condition affected his ability to stand, reach, sit, and kneel. Tr. 109, 392.)

Rubildo described feeling pain in his upper and lower back, towards the sides of his waist, in the neck area, and radiating towards his legs and feet. He felt shooting pain in the cervical area, strong muscle spasms, and numbness in his hands and legs. His pain worsened with movement, such as bending, and sitting, standing, or walking for too long. Cold temperatures also affected him. He claimed feeling pain all the time, even sometimes while medicated. The pain prevented him from sleeping. He also reported that his medications (Neurontin, Cataflan, Relafen) were not very effective, that his pain had worsened during the twelve months prior, and that he had not improved even with a change of medication. Hot pain patches gave him some short-term relief. Tr. 93, 367.

Rubildo claimed that his pain limited his activities; he could not sit down for long, walk much, could not bend, and had to constantly change positions. He needed help getting dressed. The pain and anxiety affected his eating, sleeping, and grooming habits (he would forget to shower and did not want to shave), and caused him to be in a bad mood. He also felt depressed, anhedonic, anxious, annoyed, and preferred to be alone. He could not work, exercise, drive, shop, handle money, cook, or go to parties, but watched television (the noise helped him relax and fall asleep) and went to church weekly. He also felt that his conditions were affecting his relationship with his partner, but otherwise he had no problem getting along with family, friends, neighbors, or authority figures, although he preferred avoiding social activities. He did not know how to handle stress, and changes in routine upset him. His medications affected his ability to think, concentrate, and remember by making him drowsy and confused. Tr. 94-101, 368-375.

The case was referred for consultative examinations and RFC assessments. Tr. 214, 528.

### Dr. Carlo I. Maldonado-Santos ("Dr. Maldonado")

Dr. Maldonado conducted a consultative psychiatric evaluation on December 17, 2012 "in order to assess the effect of the alleged mental condition in the functionality of the claimant." Tr. 512. Rubildo expressed to Dr. Maldonado that he began feeling extremely tense and anxious while working as a corrections officer. Afterwards, while working as an emergency medical technician, he felt severe back pain. Since then, he felt

unproductive, frustrated, and constantly preoccupied by his economic difficulties. He also suffered from low self-esteem, insomnia, anxiety, anhedonia, sadness, irritability, and felt loss of energy, appetite, sexual desire and libido, and concentration and suffered from low self-esteem. He also became reclusive and had suicidal thoughts, but no attempts or self-mutilation. Tr. 512-513.

When asked about function, Rubildo expressed that he was able to bathe, dress, and feed unassisted. He claimed being unable to drive, use mass transportation, go grocery shopping independently, prepare simple meals, pay bills on time, manage finances, administer his own medication, or do household chores. Tr. 514.

Dr. Maldonado observed that Rubildo had a slow gait but walked unassisted. As to his behavior and attitude, Rubildo made good eye contact, and was cooperative, but uneasy. He was oriented in time, place, and person, with good concentration, and fair attention and memory. His speech pattern and process were logical, relevant, and coherent. His mood was dysthymic and his affect, restricted. He presented paucity of thought, superficial judgment and introspection, with an automatic negative thought content and low self-worth. He also appeared distracted and his attention diminished. Tr. 215, 515-516

Dr. Maldonado diagnosed major depressive disorder, recurrent, severe without psychotic features, and an anxiety disorder. Prognosis was guarded. Dr. Maldonado found that Rubildo's capability to carry out sustainable or persistent work or activity seemed diminished, and that he presented a GAF of 55. Tr. 215, 516.

### Dr. Marisol Mubarak ("Dr. Mubarak")

Dr. Mubarak conducted a consultative neurological evaluation on January 11, 2013. Rubildo was alert, conscious, and oriented in all three spheres, and presented no aphasia, apraxia, or agnosia. As to coordination, Rubildo showed a slow abnormal gait with a rigid spine. He was able to touch his nose with his finger, and climb on the examiner's table. As to motor functioning, his hands and lower and upper extremities were normal. He could grip, grasp, pinch, finger tap, opposition of fingers, button a shirt, pick up a coin, and write with both hands. Rubildo had decreased strength in his hands and extremities (4.5 out of 5) associated to carpal tunnel syndrome, as evidenced by a positive Tinel's test in his right hand. As to his back, Rubildo showed trapezius and paraspinal muscle spasm, and lumbosacral pain. Dr. Mubarak diagnosed Rubildo with cervical discogenic disease,

myositis, and right carpal tunnel syndrome, and recommended physical therapy and pain management, and avoid high impact exercises and lifting weight over 25 pounds. Tr. 25, 215, 234, 517-525. A radiographic evaluation ordered by Dr. Mubarak showed a normal thoracic spine. Tr. 526.

### Dr. Russell Phillips ("Dr. Phillips")

Dr. Phillips prepared a mental RFC assessment on January 21, 2013. Dr. Phillips found that despite Rubildo's mental impairments, he was able to persist at simple, repetitive tasks over time under ordinary conditions. In Dr. Phillips' opinion, the treating source's psychiatric report was vague and overly broad, and there were no findings in the record that supported an assessment of any marked limitations in Rubildo's mental functioning. Tr. 220-222.

### Dr. Jose Gonzalez-Mendez ("Dr. Gonzalez")

Dr. Gonzalez (neurologist) assessed on March 13, 2013 that, based on the medical record, Rubildo did not have the physical RFC to perform past relevant work, but despite his exertional limitations, he had the RFC to perform light unskilled work. Rubildo could occasionally (cumulatively 1/3 or less of an 8-hour day) lift and/or carry twenty pounds, frequently  (cumulatively more than 1/3 up to 2/3 of an 8-hour day) lift and/or carry ten pounds, stand and/or walk (with normal breaks) about six hours in an 8-hour workday, sit (with normal breaks) about six hours in an 8-hour workday, and unlimitedly push and/or pull (including operation of hand and/or foot controls), except for manipulative limitations reaching overhead, in front, and/or laterally, and limited feeling (skin receptors) with both hands. He could, however, do unlimited handling (gross manipulation) and fingering (fine manipulation). Dr. Gonzalez also found that Rubildo had postural limitations. Rubildo could unlimitedly climb ramps/stairs and balance, but could only frequently climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl. Tr. 218-220, 527.

The claim was denied on March 13, 2013, with a finding that Rubildo could not perform past relevant work, and that his RFC limited him to a full range of light unskilled work, such as garment sorter, shirt folding machine operator, and spice mixer. Tr. 73, 209, 215-216, 223-224, 249-252.

On April 12, 2013, Rubildo requested reconsideration, claiming that as of December 2012, the pain in the cervical area and lower back was more intense, and

irradiated to his head and throughout his back. He felt numbness in both arms and hands, and was very depressed. He felt anxious, hopeless, helpless, and had difficulty sleeping. He also claimed having new limitations as a result of the conditions he had reported in his disability report: that he had limitations to rotate, incline, or elevate his head; to bend, stoop, prolonged sitting, standing or walking, handling, grasping, lifting or carrying (specially with his right hand). He also had limitations tolerating noises and being in crowded places, and preferred to be isolated at home. He did not claim having new illnesses or conditions, and did not submit additional evidence. Tr. 228, 253, 379.

### Dr. Barbara Hernandez ("Dr. Hernandez")

The case was referred on reconsideration to Dr. Hernandez (psychologist), who found on August 27, 2013 that the medical evidence from the hospital lacked a full mental status and revealed that Rubildo continued using a moderate level prescription. She adopted the prior denial and affirmed the decision as written. Tr. 234-235.

### Dr. Magda Rodriguez ("Dr. Rodriguez")

The case was also referred to Dr. Rodriguez (internist) at the reconsideration level. Dr. Rodriguez found on August 28, 2013 that the medical evidence showed that Rubildo had a severe spine condition, but that the impairments did not meet or equal any listing severity. She found that the preponderance of the available data supported cervical herniated nucleus pulposus without radiculopathy and active bilateral arterial thoracic outlet syndrome and carpal tunnel syndrome, and that there was no objective findings supporting significant pathology affecting the lower back or the lower extremities. Tr. 235-236.

On September 4, 2013, the claim was denied upon reconsideration, Tr. 226, 248, 254-255.

At Rubildo's request (Tr. 258), a hearing was held before an ALJ on October 24, 2014. Rubildo, Dr. Hector Guerra (the vocational expert ("VE")), Dr. Javier Anaya ("Dr. Anaya"), and Dr. June Jimenez ("Dr. Jimenez") testified. Tr. 37-72.

Dr. Anaya testified that there was evidence that Rubildo had carpal tunnel syndrome on both hands (Tr. 42), but he couldn't find an evaluation by a hand surgeon (although there was a recommendation in the record for evaluation and surgery), and that Dr. Mubarak found that Rubildo's hand strength of 4.5 out of 5 was basically normal. Tr.

Rubildo v. Commissioner of Social Security, Civil No. 16-2584 (ADC)                    13

41. Dr. Anaya further testified that Rubildo had the following physical limitations: lift, carry, push, or pull up to 20 pounds occasionally and 10 pounds frequently; sit down for up to six hours; stand and/or walk up to six hours in combination; use his hands to reach over the head occasionally and reaching in all directions frequently; handle, finger, or feel occasionally with both hands; climb stairs and ramps frequently; never climb ladders or scaffolds; balance frequently; no climbing ropes, ladders, or scaffolds;  stoop, kneel, crouch, or crawl occasionally; move mechanical parts occasionally; never be at unprotected heights or exposed to extreme heat or cold, but could occasionally be exposed to vibrations; and drive a vehicle occasionally. Tr. 43-45.

Upon questions by counsel, Dr. Anaya testified that he noted a discrepancy between the results of the Tinel's test and the EMG performed under the SIF. The right hand positive test results were consistent, but he gave weight to the EMG and gave limitations to the left side as well, so he considered the presence of carpal tunnel syndrome in both hands when indicating that Rubildo could handle and feel frequently and that he had good strength and bone movement. Tr. 46-47. When asked if Rubildo felt hand pain, Dr. Anaya answered that pinprick sensation was diminished in the upper extremities but not the hands, and that the major complaint of pain was in the neck area, so that's why he suggested that Rubildo could only lift his neck occasionally. Tr. 46-47.

Dr. Jimenez testified that the record evidence was consistent with a severe single episode depression disorder, as diagnosed by his treating psychiatrist, and generalized anxiety disorder. Tr. 47. Dr. Jimenez noted that Rubildo started formal psychiatric treatment with Dr. Mariano by Mach 23, 2012, and had a hospitalization at San Juan Capestrano hospital. The documented symptoms in those treatment records, along with the consultative evaluation by Dr. Maldonado that is consistent with the treating sources' progress notes, led Dr. Jimenez to believe that Rubildo's mental condition met Listing 12.04(A)1 from March 23, 2012 up to December 9, 2013 (as per visits with Dr. Mariano).  Tr. 48-51. Dr. Jimenez further testified that he believed Rubildo improved in 2014 and could perform simple and repetitive tasks, make simple work decisions, maintain attention and concentration for extended periods of time with normal breaks, occasionally interact with the public and frequently with coworkers and supervisors. Tr. 51-53.

Rubildo testified that he had considered getting a job after his work injury, but his treating doctor told him he couldn't work, and he made no attempts of going back to work. He felt pain in his hands, neck and back, and had difficulty using his hands on a daily basis because he would feel pain and cramps. For example, he could not pick up a milk gallon for long; he had to set it down immediately. His daily routine included being woken up by his pain, eating meals prepared by his family, and lying down. He watched television and went outside to distract himself, but did not drive because his medications made him sleepy. He went church on Sundays, and needed company to go to medical appointments. He did not do chores because of the pain and lack of motivation. Without medications, his pain was an 8 out of 10 and, with medications, it was a 4 out of 10. Tr. 57-63.

The ALJ asked Dr. Guerra, the VE, whether a person with the following limitations could work: lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; sit six hours in an 8-hour workday;  stand and/or walk six hours; no reaching above the shoulder on either side and occasional reaching in all directions;  frequent bilateral handling and fingering; occasional climbing up ramps, stairs, ladders, ropes, or scaffolds;  occasional crawling and stooping; frequent kneeling, crouching, or balancing; no work around unprotected heights, moving mechanical parts, or vibrations; frequent operation of a motor vehicle; ability to concentrate, understand, and remember routine and simple instructions; carry out routine repetitive tasks; occasional contact with the public; frequent contact with coworkers and supervisors; and making simple work-related decisions. The VE answered that such a person would not be able to perform past work but could work as an electronics worker (light work), ampoule filler (light work), and taper (sedentary work). Tr. 67-69.

The ALJ then asked the VE a second hypothetical; whether such a person, with the additional limitations of occasional bilateral handling and feeling instead of frequent bilateral handling and fingering could work. The VE answered that the limitation eroded the occupational base to two out of the three occupations. Tr. 70.

The third hypothesis was whether such a person, that could also reach overhead occasionally, kneel and crouch occasionally, occasionally work around moving mechanical parts and vibrations and drive, and could not climb ropes, ladders, or scaffolds, could work. The VE answered that such a person could do the jobs he mentioned in the first hypothetical. Tr. 71.

On November 14, 2014, the ALJ found that Rubildo was not disabled under sections 216(i) and 223(d) of the Act. Tr. 18. The ALJ sequentially found that Rubildo:

(1) had not engaged in substantial gainful activity since his alleged onset date of June 21, 2011 through his date last insured (Tr. 20);

(2) had severe impairments: severe cervical sprain with a bulging disc at level C5-C6 and a disc protrusion at level C6-C7, bilateral carpal tunnel syndrome, myositis, obesity, and depression and anxiety disorder (Tr. 20);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 21);

(4) could not perform past relevant work, but retained the RFC to perform less than the full range of light work[3] as defined in 20 CFR 404.1567(b) (Tr. 22-23); and

(5) as per his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Rubildo could perform (such as electronic worker, ampoule filler, and tapper printer circuit layout). Tr. 30-31.

Rubildo requested review of the ALJ's decision, which the Appeals Council denied on July 11, 2016, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-7, 420-424. The present complaint followed. Docket No. 2.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on

---

[3] The ALJ found that Rubildo could occasionally lift and carry 20 pounds and 10 pounds frequently, sit six hours out of an eight-hour day, and walk and/or stand six hours out of an eight-hour day. Rubildo could bilaterally reach overhead occasionally, and frequently reach in all directions. He could frequently handle, finger and feel. He could occasionally climb ramps and stairs, but could not climb ladders, ropes and scaffolds. He could occasionally stoop, kneel, crouch, and crawl. He could not work around unprotected heights, could occasionally work around moving mechanical parts and could not be exposed to extreme temperatures. He could occasionally be exposed to vibration and could occasionally drive.

Rubildo could concentrate, understand and remember routine and simple instructions, and carry out routine, repetitive tasks. He could occasionally have contact with the public and frequent contact with co-workers and supervisors. He could perform no more than simple work-related decisions. Tr. 23.

Rubildo's age, education, work experience, and RFC, there was work in the national economy that he could perform, thus rendering him not disabled within the meaning of the Act. The ALJ determined that through the date last insured, Rubildo retained the RFC to perform less than the full range of light work.[4] Tr. 22-23. Rubildo argues that the ALJ gave the VE an incomplete hypothetical question, and that the ALJ's RFC determination was erroneous. He specifically argues two main points: (1) that the Commissioner did not adequately assess his RFC, pointing to the ALJ's finding that he could frequently handle, finger, and feel, instead of occasionally as testified by Dr. Anaya, and (2) that the Commissioner failed to find that he met Listing 12.04 from March 23, 2012 to December 9, 2013, as testified by Dr. Jimenez (see Tr. 50).

Regarding physical limitations, the ALJ adopted Dr. Anaya's RFC assessment as testified, except for the portion pertaining to handling, fingering, and feeling. The ALJ concluded that Rubildo could frequently handle, finger, and feel, whereas Dr. Anaya had testified that Rubildo could only do so occasionally. Docket No. 17, p. 6-7. The ALJ gave great weight to Dr. Anaya's testimony, that Rubildo had bilateral carpal tunnel syndrome as evidenced in an EMG, that there was no evidence that Rubildo consulted a hand surgeon, and that Dr. Mubarak's examination revealed that Rubildo was able to do fine and gross fingering, and had 4.5 out of 5 strength in his hands, triceps, biceps, and lower extremities. Tr. 26-27. In the decision, the ALJ also cited Dr. Anaya's RFC assessment. Tr. 27. Dr. Anaya testified that Rubildo could use his hands to reach over his head occasionally with both sides, reach over in all directions with both sides, and handle, finger, and feel occasionally. In the ALJ's decision, instead of citing Dr. Anaya's testimony that Rubildo could do "[h]andling, fingering and feeling occasionally" (see Tr. 44), the ALJ wrote in the decision that "[h]e could frequently handle, finger and feel." I note that the transcript reflects the following answer to the ALJ's question whether Rubildo could reach in all directions: "Frequently with both. Both. Handling, fingering and feeling occasionally."

---

[4] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of up to ten pounds, walking or standing up to six hours of an eight-hour workday, and some pushing or pulling. Light work includes sedentary work, or work that requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour work day, occasional walking and standing for no more than about two hours a day, and good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a) & (b); SSR 83-10.

The court could remand to clarify this for the record, but the record as a whole supports a finding that Rubildo had the RFC to perform less than light work as specified in the ALJ's decision, particularly that he could frequently handle, finger, and feel. While Rubildo reported in April 2013 feeling numbness in his hands and having new limitations in his ability to handle, rasp, lift, and carry, especially with his right hand, in two function reports that Rubildo submitted in October 2012 and in August 2013, he check-marked how his conditions affected him, and he did not check-mark the use of his hands as one of the functions affected by his conditions in either report. Tr. 100, 109, 228, 253, 374, 379, 392. The ALJ acknowledged and considered Rubildo's pain allegations and the evidence on record and as he testified at the hearing, noting that Rubildo had bilateral carpal tunnel syndrome and that the record contained a recommendation for a hand surgery evaluation. Tr. 24. Moreover, Dr. Mubarak, who conducted a consultative neurological evaluation in January 2013, found that Rubildo's motor functions in his hands and extremities were normal, and that he could grip, grasp, pinch, finger tap, oppose fingers, button a shirt, pick up a coin, and write with both hands. He tested positive for right hand Tinel's test, and showed decreased strength in his hands and extremities, associated with Carpal Tunnel syndrome, and she recommended he avoid lifting weight over 25 pounds. Tr. 517-525. The ALJ gave some weight to Dr. Mubarak's (consultative neurologist) examination of Rubildo, who found that there was no dropping of objects and only occasional difficulty in opening jars. The ALJ agreed with Dr. Mubarak's recommendation that he avoid lifting weight over 25 pounds and high impact. Tr. 25.

Also, while in treatment under the SIF, Dr. Stella evaluated Rubildo in May 2012 and did not find Tinel's sign. Tr. 488. Further tests showed that his fingers were normal. Tr. 470, 478. Dr. Gonzalez offered a state agency RFC assessment, that Rubildo could perform light work including unlimited handling (gross manipulation) and fingering (fine manipulation) although he had limited feeling with both hands. The ALJ adopted this RFC assessment but with extra limitations that he could only frequently handle, finger, and feel, and that he could not climb ropes, ladders or scaffolds at all. Tr. 28, 218-220, 527.

As to Rubildo's mental impairments, the ALJ found that Rubildo could concentrate, understand and remember routine and simple instructions, and carry out routine, repetitive tasks. He could occasionally have contact with the public and frequent contact with co-

workers and supervisors. He could perform no more than simple work-related decisions. Tr. 23. Rubildo claims that the ALJ failed to properly consider Dr. Maldonado's and Dr. Mariano's notes and opinions, and failed to find that he met Listing 12.04 from March 23, 2012 to December 9, 2013 as testified by Dr. Jimenez, and should be granted benefits for that time period.[5]

The ALJ cited various reasons for straying from the above medical opinions. The ALJ gave partial weight to Dr. Jimenez's opinion, not agreeing with the Listing 12.04 assessment because in his opinion the record did not reflect a period of 12 or more months severity at a listing level of severity, but adopted that RFC assessment. Tr. 28. The ALJ also gave little weight to Dr. Mariano's opinion as a treating source because the ALJ found it to be inconsistent with the whole record, did not provide a functional assessment, and was conclusory in nature. Tr. 9. The ALJ also gave partial weight to the consultative psychiatrist's assessment because he disagreed with Dr. Maldonado's opinion that Rubildo had diminished capability to carry out sustainable or persistence work or activity, and gave great weight to the consultant examiner's report, which reflected a moderate and not marked degree of impairment, which the ALJ found to be consistent with the overall evidence. Tr. 26, 28

Paragraph B criteria of Listing 12.04 requires that a claimant demonstrate that he has at least two of the following four restrictions: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpt. P, App. 1. The ALJ addressed these criteria under the step three discussion of his decision, finding that Rubildo's impairments

---

[5] Dr. Jimenez testified that in her opinion Rubildo's conditions met Listing 12.04 from March 23, 2012 to December 9, 2013, but that Rubildo's 2014 treatment record shows that he improved and could concentrate, understand and remember routine and simple instructions, and carry out routine, repetitive tasks. He could occasionally have contact with the public and frequent contact with co-workers and supervisors. He could perform no more than simple work-related decisions. Dr. Mariano's 2014 progress notes also show that, in 2014, Rubildo was oriented, coherent, and had good memory, attention, concentration, judgment, and insight. This evidence supports the ALJ's mental RFC finding for after the time period being questioned.

did not meet listings 12.04[6] because he presented moderate and not marked restrictions in daily living, social functioning, and maintaining concentration, persistence or pace, with no repeated episodes of decompensation. Tr. 21-22.

Reviewing the evidence on record, I note that Rubildo began continuous treatment with Dr. Mariano in March 2012, and with Dr. Cubano in July 2013, with a partial hospitalization for depression in July 2013. According to Dr. Mariano's 2012 record, Rubildo appeared to have diminished memory, attention, intellectual functions, and judgment. He was incoherent, irrelevant, and illogical, and had poor insight and stress tolerance. Dr. Mariano also opined that Rubildo's activities of daily living were diminished, that he had no social functioning or ability to focus and persist in tasks. Dr. Cubano's notes indicate that Rubildo was decompensated. Dr. Maldonado, who evaluated Rubildo in a consultative capacity, opined that his capability to pay attention and carry out sustainable or persistent work seemed diminished. Dr. Jimenez, who also reviewed the full record, testified that Dr. Maldonado's evaluation is consistent with the treating sources' progress notes, and that the record supports a finding that Rubildo's mental condition met Listing 12.04A(1) from March 23, 2012 to December 9, 2013. And although the ALJ addressed paragraph B of Listing 12.04, he did not specifically address paragraph A.

There are also three GAF findings pertaining to the time period in question, which relates to social and occupational functioning. Rubildo's GAF was at 50 as per Hospital San Juan Capestrano records of July 2013, at 40 in November 2012 according to Dr. Mariano, and at 55 as assigned by Dr. Maldonado in December 2012. The ALJ used Dr. Maldonado's GAF assessment in finding that Rubildo showed moderate and not marked limitations, and in concluding that the record did not show a period of twelve months or more at a listing level of severity.

After considering the above evidence, it is my impression that the ALJ's finding that Rubildo did not meet a listing level of impairment for the time period in question is hanging by a slender reed. Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *See Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*,

---

[6] The ALJ also considered Listing 12.06 for complete inability to function independently outside the home. Tr. 22.

647 F.2d 218, 222 (1st Cir. 1981)); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987). While an ALJ "is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Here, the great weight of the evidence summarized above, supports Dr. Jimenez's assessment, which the ALJ, without substantial support, set to one side. Therefore, I recommend to the court that the case be remanded with instructions to amend benefits based on Rubildo's mental conditions for the time period of March 23, 2012 to December 9, 2013.

On a final matter, Rubildo claims that the ALJ did not explain the reasons for giving partial weight to the State Agency consultant's assessment and instead adopted his own assessment in lieu of the medical opinions. An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* And ordinarily, an "ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso-Pizarro*, 76 F.3d at 17. I find that the ALJ's decision contains a summary of the evidence he considered, and the discussion of the evidence is sufficient to give the court notice of the weight given to the treating and non-examining physicians, and Rubildo's claim that the ALJ did not offer good reasons[7] for the weight given is meritless.

## CONCLUSION

For the foregoing reasons, the court should **REVERSE** the Commissioner's decision and **REMAND** the case to award benefits based on Rubildo's mental conditions for the time period of March 23, 2012 to December 9, 2013.

---

[7] Once the ALJ decides what weight to give a treating source, under the "good reasons" requirement, he is required to include in the notice of determination "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 2nd day of February, 2018.


*s/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge